UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ACTIAN CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>SS&C TECHNOLOGIES, INC.,<br><br>Defendant. | Case No. 24-cv-05064-HSG<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS**<br><br>Re: Dkt. No. 25 |

Pending before the Court is Defendant SS&C Technologies, Inc.'s motion to dismiss. Dkt. No. 25. The Court finds this matter appropriate for disposition without oral argument and the matter is deemed submitted. *See* Civil L.R. 7-1(b). For the reasons detailed below, the Court **GRANTS** the motion.

## I.  BACKGROUND

As relevant to the pending motion, Plaintiff Actian Corporation owns a "database management system," known as Pervasive PSQL and Actian Zen (the "Software" or "Plaintiff's Software"). *See* Dkt. No. 1 ("Compl.") at ¶ 1. Defendant entered into an agreement with Plaintiff's predecessor to license the Software for use in Defendant's own products. *See id.* at ¶¶ 12, 16; Dkt. No. 1-7, Ex. F ("OEM Agreement"). Defendant licensed and used editions of the Software in its own software applications, known as Skyline and HiPortfolio, to "receive, store, analyze and output data." Compl. at ¶¶ 2–4. Skyline is a lease management platform, and HiPortfolio is a wealth management platform. *See* Dkt. No. 25 at 2. Defendant, in turn, distributed the Skyline and HiPortfolio products ("OEM Products") to third parties and third-party resellers. *See* Compl. at ¶¶ 22–23, 35. Under the OEM Agreement:

> [Defendant] only has the right to market and distribute the Software to those parties who use the OEM Product for their own internal business purposes or personal use ("End Users") and to third parties ("Resellers") who acquire the OEM Product for remarketing to End Users. Except as expressly authorized in the Pervasive EULA (as defined below), OEM shall not, and shall not authorize its Resellers and End Users to, rent, lease, or time share the Software or documentation or any part thereof, or use the Software to host applications for third parties or to provide service bureau, time-sharing or other computer services to third parties.

OEM Agreement (§ 1.3).

Plaintiff alleges that in March 2024, when the OEM Agreement expired, it discovered that Defendant had been using the Software improperly. *See id.* at ¶¶ 22–23. According to Plaintiff, Defendant habitually selected the least expensive version of the Software for use in its OEM Products, but the licenses for these versions did not permit Defendant's actual use. *See id.* at ¶¶ 4, 14, 22–23. Specifically, Plaintiff contends that the cheaper versions of its Software can only be used if the OEM Product is for "internal business purposes" or "personal use," and cannot be used "to host applications for third parties or to provide service bureau, time-sharing or other computer services to third parties." *See id.* at ¶¶ 18, 19. Only the "Vs Server Edition" of Plaintiff's Software could be used without such restrictions. *See id.* at ¶¶ 19–21. For example, according to Plaintiff, Defendant distributed its OEM Product Skyline to landlords, who used it—and thus the Software incorporated into the product—for "non-internal business purposes" and "non-personal uses" by providing access to tenants. *See id.* at ¶ 28. Plaintiff also alleges that Defendant hosted the Software for these landlords, and allowed them to "rent, lease, or time share" the Software. *See id.* Plaintiff alleges that Defendant's failure to license and use the "Vs Server Edition" of the Software in its OEM Products violated the Software's End-User License Agreements ("EULAs") as well as the parties' OEM Agreement. *See id.* at ¶¶ 4, 12–13, 15, 28.

Based on these allegations, Plaintiff brings three claims against Defendant for (1) breach of contract; (2) copyright infringement; and (3) negligence. *Id.* ¶¶ 25–48. Defendant moves to dismiss Plaintiff's claims in their entirety. *See* Dkt. No. 25.

**II. PERSONAL JURISDICTION**

As an initial matter, Defendant argues that the Court lacks personal jurisdiction over it and

thus moves to dismiss the case under Federal Rule of Civil Procedure 12(b)(2). *See* Dkt. No. 25 at 4–12; *see also* Compl. at ¶ 2 ("Defendant SS&C Technologies, Inc. is a Connecticut corporation having its headquarters at 80 Lamberton Road, Windsor, CT 06095."); Dkt. No. 25-1 ("Bremner Decl.") at ¶ 3 ("SS&C Tech is organized under the laws of Delaware with its principal place of business/headquarters in Windsor, Connecticut.").

### A.  Legal Standard

"When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that the court has jurisdiction over the defendant." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006). At the motion to dismiss stage, "the plaintiff need only make a prima facie showing of jurisdictional facts" that "if true would support jurisdiction over the defendant." *See Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995). "Although the plaintiff cannot simply rest on the bare allegations of [the] complaint, uncontroverted allegations in the complaint must be taken as true." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004) (quotations omitted). The Court must also resolve any conflicts in the evidence in the plaintiff's favor. *Id.*

Where no federal statute governs personal jurisdiction, the Court applies the law of the state in which it sits—here, California. *See id.* California law allows for the exercise of "jurisdiction on any basis not inconsistent with the Constitution of th[e] state or of the United States." Cal. Civ. Proc. Code § 410.10. Due process accordingly requires that a non-resident defendant have either a "substantial, continuous, and systematic" presence in the forum state or sufficient "minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quotations omitted). A plaintiff may invoke either general or specific personal jurisdiction. *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1068 (9th Cir. 2015). "The strength of contacts required depends on which of the two categories of personal jurisdiction a litigant invokes." *Id.*

### B.  Discussion

Plaintiff argues that the Court has both general and specific personal jurisdiction over

Defendant. *See* Dkt. No. 35 at 9–16. Plaintiff's primary argument, however, is that the Court has personal jurisdiction over Defendant based on a forum selection clause in the EULAs. *See* Compl. at ¶ 6; Dkt. No. 35 at 9–13. Given the weight the parties give to this argument, the Court considers the forum selection clause before turning to Plaintiff's other arguments for general and specific jurisdiction.

### i. Forum Selection Clause

Because personal jurisdiction is a waivable right, a forum selection clause can, on its own, establish consent to personal jurisdiction in a specific forum. *See S.E.C. v. Ross*, 504 F.3d 1130, 1149 (9th Cir. 2007); *see also Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 458 (9th Cir. 2007) ("Under general contract principles, a forum selection clause may give rise to waiver of objections to personal jurisdiction, provided that the defendant agrees to be so bound.") (internal citation omitted). Here, Plaintiff contends that Versions 13 and 14 of the Software's EULAs contain a forum selection clause selecting the Northern District of California as the appropriate forum for its claims against Defendant:

> 12.3  Governing Law and Venue. Any action related to this Agreement shall be governed by California law and controlling U.S. federal law, and the choice of law rules of any jurisdiction shall not apply. . . . All disputes arising out of or relating to this Agreement shall be brought exclusively in the federal courts located in the Northern District of California or the state courts located in Santa Clara County, California, and the parties agree to submit to the exclusive jurisdiction and venue of such courts. . . .

*See* Dkt. No. 1-2, Ex. A ("EULA v.13") at 8 (§ 12.3); Dkt. No. 1-5, Ex. D ("EULA v.14") at 9 (§ 11.3). Critically, the parties dispute whether (1) Defendant ever agreed to EULA v.13 or EULA v.14; and whether (2) Plaintiff's claims "arise out of" or are "related" to these agreements such that the forum selection clause, even if consented to, actually applies here.

By their terms, the EULAs are "a legal agreement between the end user downloading or installing the software ('you') and Actian Corporation . . . ." *See, e.g.*, EULA v.13 at 1.[1] The

---

[1] The Court notes that the OEM Agreement defines "end user" as "those parties who use the *OEM Product* for their own internal business purposes or personal use." *See* OEM Agreement at 2

4

EULAs state that "[b]y downloading, installing or using the software . . . you [the end user] are agreeing to be bound by this agreement." *See id.* Plaintiff argues that Defendant agreed to EULA v.13 and EULA v.14 "hundreds—if not thousands—of times" because it was an end user of the Software. *See* Dkt. No. 35 at 1. But the EULAs do not define "end users." The dictionary defines the term as "the ultimate consumer of a finished product."[2] This is consistent with how the term is defined in the OEM Agreement as "those parties who use the OEM Product for their own internal business purposes or personal use." *See* OEM Agreement at 2 (§ 1.3); *cf.* Dkt. No. 35 at 11 (alleging Defendant "has repeatedly installed and use the Software and done so for its own internal business purpose"). An end user under the EULAs, therefore, appears to be someone who uses the Software for their own internal business or personal use.

Plaintiff briefly suggests that Defendant is an "end user" bound by the EULAs because it hosts some of its OEM Products for customers. *See* Dkt. No. 35 at 12; *see also* Dkt. No. 35-1 ("Gu Decl.") at ¶¶ 23–25; Dkt. No. 35-6, Ex. E at 9. Plaintiff concludes that Defendant therefore hosts the Software that is incorporated into the OEM Products. *Id.* But Plaintiff does not explain how, by hosting the OEM Products and Software for customers, Defendant is also an end user of the OEM Products or Software. Even if hosting is considered use, it appears to be for external commercial uses rather than Defendant's own internal use.

Plaintiff also states that Defendant acquired hundreds of Software licenses for its own internal business use. *See* Gu Decl. at ¶¶ 13–17; *see also* Dkt. No. 35-3, Ex. B (2018 shipping order for 140 "not-for-resale licenses" of Actian Zen); Dkt. No. 35 at 5. Plaintiff explains that Defendant required these licenses "to build, test, sell, and service its OEM Products." *See* Gu Decl. at ¶ 14. For example, Plaintiff cites to a customer support request from Defendant in which

---

(§ 1.3) (emphasis added). At times, Plaintiff appears to conflate the end user of its Software with the end user of the OEM Products. *See* Dkt. No. 35 at 6, 11. But Plaintiff does not provide evidence that Defendant used its own OEM Products for "internal business purposes or personal use." To the contrary, the parties' business arrangement assumes that Defendant is using the Software to create OEM Products to sell to third parties and resellers. *See* OEM Agreement at 2 (§§ 1.1–1.6). Defendant, therefore, does not appear to be an end user for purposes of the OEM Agreement.

[2] *See End User*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/end%20user (last accessed September 22, 2025).

it identified differences between versions of the Software that were causing problems for Defendant's OEM Products. *See id.* at ¶¶ 18–19; Dkt. No. 35-4, Ex. C. Plaintiff thus concludes that Defendant must have downloaded the Software for testing, and in doing so, agreed to the EULAs which bind any end users who download, install, or use the Software. *See* Gu Decl. at ¶¶ 19, 25; Dkt. No. 35 at 11–12; EULA v.13 at 1.

But even assuming that at times Defendant used the Software for its own internal business purposes, and thus agreed to the EULAs in that context, this case is not about Defendant's internal testing or internal use of the Software. Rather, Plaintiff alleges that Defendant bundled the wrong (and less expensive) versions of the Software into its OEM Products for distribution to third-party end users and resellers. *See generally* Compl.; *see also* Dkt. No. 35 at 4 ("[Defendant] refused to purchase the required licenses, and it deliberately distributed the Software without the required license to its customers."). Plaintiff has not explained how Defendant agreed to the EULAs, and specifically their forum selection clause, in this commercial context. To the contrary, the EULAs themselves only contemplate use of the Software for "internal business purposes" and not for "production or commercial purposes." *See, e.g.*, EULA v.13 at 4 (§§ 2.2–2.4). It is the OEM Agreement, not the EULAs, that provides for Defendant's outside marketing and distribution of the OEM Products. *See* OEM Agreement at 2 (§§ 1.1–1.6); *see also* Dkt. No. 35 at 3 ("The OEM Agreement allowed [Defendant] to sell the OEM Products bundled with editions of the Software.").

In short, even when viewed in the light most favorable to Plaintiff, the record does not demonstrate that Defendant agreed to the EULAs such that their forum selection clauses are relevant and apply to the claims at issue in this litigation.[3]

### ii. General Jurisdiction

In the alternative, Plaintiff urges that the Court has general jurisdiction over Defendant. *See* Dkt. No. 35 at 16. "General jurisdiction . . . permits a court to hear any and all claims against

---

[3] The Court further notes that the OEM Agreement contains its own choice of law and forum selection clause, identifying New York and Texas courts as non-exclusive but proper venues "for all Disputes arising under" the OEM Agreement. *See* OEM Agreement at 4–5 (§§ 15.4.1–15.4.2.).

a defendant, whether or not the conduct at issue has any connection to the forum." *Ranza*, 793 F.3d at 1068 (quotation omitted).  A court may exercise general jurisdiction over a defendant when that defendant's activities are so "continuous and systematic as to render them essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (quotation omitted). Corporate defendants are "fairly regarded at home" where they are incorporated and principally do business.  *Id.* at 137.

Here, Plaintiff offers little in support of its general personal jurisdiction argument.  It notes that Defendant maintains four offices in the state (approximately 4.5% of its workforce) and runs other California-based companies that it acquired in 2015 and 2020.  *See* Dkt. No. 35 at 16; *see also* Bremner Decl. at ¶ 4.  But maintaining some minimal office space in the state is not enough to render the company at home here.  And to the extent Plaintiff suggests that the Court should apply an alter ego test and consider the activities of Defendant's subsidiaries, Plaintiff makes no effort to support the application of such a test here.  There is simply not enough for the Court to conclude that Defendant is "at home" in California for purposes of general jurisdiction.

### iii. Specific Jurisdiction

Lastly, Plaintiff contends that the Court has specific jurisdiction over Defendant, even as a non-resident entity. *See* Dkt. No. 35 at 13–16.  The Ninth Circuit applies a three-part test to determine whether a non-resident defendant's activities are sufficiently related to the forum state to establish personal jurisdiction:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger*, 374 F.3d at 802 (citing *Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987)).

1  "The plaintiff bears the burden of satisfying the first two prongs of the test." *Id.* "If the plaintiff fails to satisfy either of these prongs, personal jurisdiction is not established in the forum state." *Id.* However, if the plaintiff satisfies the first two prongs, then "the burden shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–78 (1985)).

### a. Purposeful Direction or Purposeful Availment

The first prong of the test contains two distinct concepts: availment and direction. *See Schwarzenegger*, 374 F.3d at 802 ("[A]vailment and direction are, in fact, two distinct concepts."). "A showing that a defendant purposefully availed himself of the privilege of doing business in a forum state typically consists of evidence of the defendant's actions in the forum, such as executing or performing a contract there." *Id.* "By taking such actions, a defendant 'purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Id.* (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). "In return for these 'benefits and protections,' a defendant must—as a quid pro quo—'submit to the burdens of litigation in that forum.'" *Id.* (quoting *Burger King*, 471 U.S. at 476). "A showing that a defendant purposefully directed his conduct toward a forum state, by contrast, usually consists of evidence of the defendant's actions outside the forum state that are directed at the forum, such as the distribution in the forum state of goods originating elsewhere." *Id.* at 803.

As the Ninth Circuit has explained, "[a] purposeful availment analysis is most often used in suits sounding in contract." *Id.* "A purposeful direction analysis, on the other hand, is most often used in suits sounding in tort." *Id.* Plaintiff does not specify which analysis should apply here. *See* Dkt. No. 35 at 13–16. Plaintiff appears to conflate the tests, at times noting that Defendant "purposely directed its activities at California" by contracting with Plaintiff. *See id.* at 13–14. In any event, the specific test does not seem outcome determinative here, and the Court instead broadly considers the nature of the contacts that Plaintiff identifies.

*First*, Plaintiff contends that Defendant purposely directed its activities at California by contracting with Plaintiff, a California company. *See* Dkt. No. 35 at 13–14; *see also* Gu Decl. at ¶¶ 11, 26–28. As discussed above, however, it is not clear that Defendant ever agreed to any of

8

the EULAs, as least not for purposes of the claims at issue here.  The Court therefore considers the OEM Agreement, which was first entered into between Defendant and Plaintiff's predecessor Pervasive Software Inc.  *See generally* OEM Agreement.  At the time, Pervasive was headquartered in Austin, Texas.  *See id.*  Later addenda to the OEM Agreement were signed by Plaintiff beginning in 2015, but there is also no information before the Court that these addenda were negotiated or signed in California.  *See* OEM Agreement at 12–21.  In any event, the Supreme Court has noted that a "contract with an out-of-state party *alone* can[not] automatically establish sufficient minimum contacts in the other party's home forum" for purposes of personal jurisdiction.  *See Burger King*, 471 U.S. at 478 (emphasis in original).  Instead, courts take a "highly realistic" approach and consider factors such as "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing [to determine] whether the defendant purposefully established minimum contacts within the forum."  *Id.* at 479.

Plaintiff does not provide any insight into these factors aside from noting that Actian is headquartered in California.  *See* Dkt. No. 35 at 13–14.  And notably, the OEM Agreement itself does not appear to invoke the benefits and protections of California.  To the contrary, the agreement states that it is governed by New York law, and contains a "non-exclusive" forum-selection clause designating Texas and New York courts as proper venues.  *See* OEM Agreement at 4–5 (§§ 15.4.1–15.4.2.).

*Second*, Plaintiff contends that Defendant sold at least some of its OEM Products to customers in the state.  *See* Dkt. No. 35 at 13–14; *see also* Gu Decl. at ¶¶ 11, 26–28.  Plaintiff does not provide any support for this assertion, but simply states in an unsworn declaration that it "believes" based on "partial customer lists" that are not in the record that Defendant had at least four customers located in California.  *See* Gu Decl. at ¶ 26.  Even if Defendant had some in-state customers, however, Plaintiff has not explained how these contacts demonstrate purposeful direction or purposeful availment rather than just "random" or "fortuitous" contacts.  *See Burger King*, 471 U.S. at 475.  Nor has Plaintiff explained how, for purposes of the second prong, Plaintiff's claims arise from these contacts.

9

In short, the Court does not appear to have either general or specific jurisdiction over Defendant, and the Court **GRANTS** the motion to dismiss on this basis.

### C.    Jurisdictional Discovery

If the Court grants Defendant's motion for lack of jurisdiction, Plaintiff requests jurisdictional discovery. *See* Dkt. No. 35 at 24–25. "A district court is vested with broad discretion to permit or deny [jurisdictional] discovery." *See Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1093 (9th Cir. 2003). "Jurisdictional discovery should ordinarily be granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary." *Yamashita v. LG Chem, Ltd.*, 62 F.4th 496, 507 (9th Cir. 2023) (quotation omitted). Nevertheless, "a mere hunch that discovery might yield jurisdictionally relevant facts, or bare allegations in the face of specific denials, are insufficient reasons for a court to grant jurisdictional discovery." *Id.* (quotation omitted).

Here, Plaintiff provides little support for its request for jurisdictional discovery. It notes that it served Defendant with discovery requests that may "bear[] directly on specific jurisdiction," and that Defendant has not yet responded to these requests. *See* Dkt. No. 35 at 24. But Plaintiff does not explain what those requests were or why Plaintiff has anything more than a "hunch" that discovery could reveal information relevant to the question of jurisdiction here.

Plaintiff's primary argument for jurisdiction was that Defendant is bound by the forum selection clauses in the EULAs. But the Court does not agree with Plaintiff's interpretations of the OEM Agreement or EULAs and thus has rejected this argument. Plaintiff now seems to be searching for another jurisdictional hook that likely does not exist. Plaintiff has already offered information regarding Defendant's operations in California and its in-state customers, and the Court found such contacts insufficient to support either general or specific jurisdiction. That discovery may reveal additional California customers, for example, would thus not alter the Court's analysis under the circumstances.

That Plaintiff would prefer to litigate the case in California is apparent, but insufficient to support the request for jurisdictional discovery. Under the circumstances, the Court thus denies

10

Plaintiff's perfunctory request for jurisdictional discovery.

The Court understands that the parties disputed whether a stay of discovery was appropriate pending the Court's decision on the motion to dismiss.  *See* Dkt. No. 43.  As noted below, the motion to stay is now moot in light of this order.  Nevertheless, and for purposes of clarifying next steps, the Court finds that a stay of discovery is warranted until this threshold jurisdictional issue can be resolved:  either Plaintiff is able to establish jurisdiction or the case will be dismissed without prejudice to refiling elsewhere.   As already explained above, the Court does not find that jurisdictional discovery is appropriate.  And moving on to merits discovery would be premature and an inefficient use of both party and court resources.  The short stay of discovery will not prejudice Plaintiff, who will be free to pursue discovery if it can establish that jurisdiction is proper here.

## III.     CONCLUSION

The Court **GRANTS** the motion to dismiss for lack of personal jurisdiction.  Dkt. No. 25.  Because the Court finds that it does not have jurisdiction over Defendant, the Court does not reach Defendant's remaining arguments.  The parties' discovery letter, Dkt. No. 40, the motion to stay discovery, Dkt. No. 43, and motion for leave to file a surreply, Dkt. No. 46, are also **TERMINATED AS MOOT**.

//
//
//
//
//
//
//
//
//
//
//

Given the nature of the jurisdictional defects, most importantly the inapplicability of the EULAs on which Plaintiff relies and the weakness of Plaintiff's general and specific jurisdiction showings, the Court is skeptical that Plaintiff could amend the complaint to survive a subsequent motion to dismiss. Still, at this stage in the litigation, the Court cannot say that amendment would be futile. Plaintiff may therefore file an amended complaint within 21 days of the date of this order. Plaintiff is cautioned, however, that it should fully plead its best case in any amended complaint as the Court is unlikely to grant further leave to amend. The Court **STAYS** all discovery pending a decision on the anticipated second motion to dismiss for lack of personal jurisdiction.

**IT IS SO ORDERED.**

Dated: 9/22/2025

HAYWOOD S. GILLIAM, JR.
United States District Judge